## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| JENNA LYNN ANTONY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 19-410-CFC-SRF |
| | ) |
| ANDREW SAUL,[1] | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## REPORT AND RECOMMENDATION

## I. INTRODUCTION

Plaintiff Jenna Lynn Antony ("Antony") filed this action on February 28, 2019 against

the defendant Andrew Saul, the Commissioner of the Social Security Administration (the

"Commissioner"). Antony seeks judicial review pursuant to 42 U.S.C. § 405(g) of the

Commissioner's January 7, 2019 final decision, denying Antony's claim for disability insurance

benefits ("DIB") under Title II of the Social Security Act (the "Act"), 42 U.S.C. §§ 401-434.

Currently before the court are cross-motions for summary judgment filed by Antony and

the Commissioner.[2] (D.I. 10; D.I. 12) Antony asks the court to remand her case for further

administrative proceedings. (D.I. 11 at 19) The Commissioner requests the court affirm the

Administrative Law Judge's ("ALJ") decision. (D.I. 13 at 20) For the reasons set forth below,

---

[1] Andrew Saul was sworn in as Commissioner of Social Security on June 17, 2019 to succeed
Acting Commissioner Nancy A. Berryhill. Pursuant to Federal Rule of Civil Procedure 25(d)
and 42 U.S.C. § 405(g), Andrew Saul was automatically substituted as the Defendant in this
action.

[2] The briefing for the present motions is as follows: Antony's opening brief (D.I. 11) and the
Commissioner's combined opening brief in support of his motion for summary judgment and
answering brief (D.I. 13). Antony did not file a reply brief and stands upon her opening brief.
(D.I. 14)

the court recommends denying Antony's motion for summary judgment (D.I. 10) and granting the Commissioner's cross-motion for summary judgment (D.I. 12).

## II. BACKGROUND

### a. Procedural History

Antony filed a DIB application on December 1, 2014,[3] claiming a disability onset date of October 15, 2014. (D.I. 6-6 at 5) Her claim was initially denied on April 15, 2015, and denied again after reconsideration on August 26, 2015. (D.I. 6-4 at 2-6, 10-14) Antony then filed a request for a hearing, which occurred on October 13, 2017. (D.I. 6-2 at 33-74) Administrative Law Judge Jerry Faust issued an unfavorable decision, finding that Antony was not disabled under the Act on May 16, 2018. (*Id.* at 14-25) The Appeals Council subsequently denied Antony's request for review on January 7, 2019, rendering the ALJ's decision the final decision of the Commissioner. (*Id.* at 2-4)

On February 28, 2019, Antony brought a civil action in this court challenging the ALJ's decision. (D.I. 1) On July 10, 2019, Antony filed a motion for summary judgment, and on September 10, 2019, the Commissioner filed a cross-motion for summary judgment. (D.I. 10; D.I. 12)

### b. Medical History[4]

Antony was born on September 23, 1985 and was 29 years old on her alleged disability onset date. (D.I. 6-2 at 23; D.I. 6-3 at 2) Antony graduated from high school and completed one

---

[3] The ALJ noted that Antony filed her DIB application on November 26, 2014, but the application is dated December 1, 2014. (D.I. 6-2 at 14; D.I. 6-6 at 5)

[4] On February 15, 2018, Dr. Irwin Lifrak ("Dr. Lifrak") completed a post-hearing consultative exam of Antony at the ALJ's direction. (D.I. 6-8 at 44, 47-49; D.I. 6-16 at 86-98) The court does not outline the contents of this report because the ALJ ultimately afforded Dr. Lifrak's opinion no weight and his opinion has no bearing on plaintiff's arguments on appeal. (D.I. 6-2 at 23; D.I. 11 at 8 n.2)

2

year of college in 2004. (D.I. 6-7 at 15) She has a prior work history as a bank teller and collection clerk. (D.I. 6-2 at 23, 64-65; D.I. 6-7 at 15) The ALJ concluded that Antony had the following severe impairments: anxiety, major depressive disorder, psoriatic arthritis, degenerative disc disease, plantar fasciitis with history of stress fracture of the left foot, and left shoulder partial deltoid tear. (D.I. 6-2 at 16)

### i. Physical Impairments

On October 16, 2014, Antony received an MRI of her left foot, which showed prominent plantar fasciitis and a prominent stress fracture and stress reaction in her calcaneal marrow. (D.I. 6-10 at 38-39) Four days later, Antony visited Dr. Philip S. Schwartz ("Dr. Schwartz")[5] for left foot pain and received an Enbrel injection[6] in her left foot. (D.I. 6-9 at 57) On October 22, 2014, Antony visited Dr. Anthony M. Caristo ("Dr. Caristo") and reported a sixty percent improvement in her left foot pain overall. (D.I. 6-10 at 73) Dr. Caristo noted that Antony's gait was antalgic, recommended limiting weightbearing on her left foot, and prescribed a removable cast for her left foot. (*Id.* at 74)

On November 10, 2014, Antony visited Dr. Nancy Kim ("Dr. Kim") for neck and left shoulder pain that was exacerbated by driving, lifting, and turning her head. (*Id.* at 2) Dr. Kim noted a normal gait, but observed a slight dowager's hump, decreased range of motion in Antony's cervical spine, and numbness and tingling in her right hand. (*Id.* at 2, 4) On the same day, Antony received an x-ray of her cervical spine and left shoulder, which revealed cervical

---

[5] Dr. Schwartz is Antony's treating rheumatologist who continues to provide treatment. (D.I. 6-2 at 59)

[6] An etanercept injection (or "Enbrel injection") is used to reduce signs and symptoms of active arthritis, rheumatoid arthritis, or psoriatic arthritis. *See Etanercept (Subcutaneous Route)*, MAYO CLINIC, https://www.mayoclinic.org/drugs-supplements/etanercept-subcutaneous-route/precautions/drg-20066850?p=1 (last visited Jan. 28, 2020).

3

disc derangement and cervical radiculopathy. (*Id.* at 7, 9) Antony also completed a New Patient Questionnaire, wherein she described joint pain, stiffness, back of neck ache, weakness, decreased range of motion, low back pain, and thoracic pain. (*Id.* at 18)

On November 19, 2014, Antony returned to Dr. Caristo and reported minimal improvement in her left foot pain with the use of her removable cast. (*Id.* at 75) Dr. Caristo noted that her progress was slow because, despite not working, Antony was on her feet for extended periods of time. (*Id.* at 75-76) Five days later, Antony visited Dr. Schwartz, who noted that despite some limitations, Antony had experienced a sixty to seventy percent improvement since starting Enbrel injections. (*Id.* at 23) Dr. Schwartz observed continued soreness and stiffness in and around Antony's left shoulder and neck, and improved scalp psoriasis. (*Id.*)

On December 2, 2014, Antony received medical imaging of her cervical spine and left shoulder, which did not reveal any evidence of acute fracture, subluxation, osseous erosion, or abnormal calcification. (*Id.* at 28) On the same day, Antony visited Dr. Richard Fischer ("Dr. Fischer"), who noted normal bilateral lower extremity strength, primary sensory modalities, and deep tendon reflexes. (*Id.* at 61) On December 17, 2014, Antony visited Dr. Galicano Inguito ("Dr. Inguito"),[7] who observed normal range of motion, strength, and gait. (D.I. 6-11 at 22) On December 29, 2014, Antony visited Dr. Caristo, noting that she stopped using the removable cast because she experienced pain with its use. (D.I. 6-10 at 77) Dr. Caristo recommended that Antony use shoe gear with anti-shock inserts and noted that her gait was antalgic. (*Id.* at 78)

On January 9, 2015, Antony completed a function report, wherein she described her attempts to complete housework and prepare meals, but admitted to mainly staying at home unless she had a doctor's appointment or needed to do grocery shopping. (D.I. 6-7 at 25) She

---

[7] Dr. Inguito is Antony's family doctor who continues to provide treatment. (D.I. 6-2 at 60)

4

stated that she cannot walk more than fifty yards without stopping or stand more than ten minutes. (*Id.* at 30) She stated that although she can drive, she avoids going outside. (*Id.* at 28) On the same day, Antony also completed a pain questionnaire, wherein she described severe neck pain, severe shoulder pain, dull hand pain, aching hip pain, and an ankle fracture. (*Id.* at 35) She stated that her shoulder pain radiates down her arms and her back pain shoots down her left leg. (*Id.*) Antony reported that she cannot stand, walk, or write for extended periods of time. (*Id.* at 36)

On January 12, 2015, Antony visited Dr. Caristo and reported that, overall, her left foot pain had improved by eighty percent. (D.I. 6-11 at 36) Antony stated that changes in shoe gear yielded minimal improvements. (*Id.*) Dr. Caristo noted that her gait was antalgic and administered a foot injection in her left heel. (*Id.* at 37) On February 2, 2015, Antony visited Dr. Inguito, complaining of low back pain in the lumbar and sacral regions. (D.I. 6-12 at 2) Dr. Inguito noted normal range of motion, strength, and gait and recommended that Antony lift no more than thirty-five pounds. (*Id.* at 3-4) Two days later, Antony returned to Dr. Caristo, reporting an eighty-five percent improvement overall. (D.I. 6-11 at 39) Dr. Caristo observed that her gait was mildly antalgic and recommended that she avoid walking barefoot and continue home physical therapy. (*Id.* at 40) Antony continued to regularly visit Dr. Inguito for low back pain and aching joints from February 2015 through August 2017. (D.I. 6-12 at 6-34; D.I. 6-14 at 2-66; D.I. 6-15 at 2-37) Throughout these visits, Dr. Inguito consistently reported that Antony had normal range of motion, strength, and gait. (D.I. 6-12 at 9, 14, 21, 27, 32, 37; D.I. 6-14 at 5, 10, 15, 19, 25, 30, 38, 43, 50, 55, 63; D.I. 6-15 at 3, 9, 15, 21, 28, 36) On March 19, 2015, Antony visited Dr. Caristo and received a foot injection in her left heel. (D.I. 6-11 at 43)

On April 8, 2015, Dr. Darrin Campo ("Dr. Campo")[8] opined that Antony had the residual functional capacity ("RFC") to perform her past relevant work. (D.I. 6-3 at 12-13) Specifically, Dr. Campo concluded that Antony could occasionally lift and carry twenty pounds and frequently lift and carry ten pounds. (*Id.* at 10) Furthermore, he stated that Antony could stand, walk, and sit for approximately six hours in an eight-hour workday. (*Id.*) On May 18, 2015, Dr. Inguito completed a physical and mental functional capacity statement, wherein he opined that Antony could lift or carry ten pounds or less rarely, sit for ten minutes at one time, and stand for fifteen minutes at one time. (D.I. 6-11 at 47) Dr. Inguito also stated that Antony could sit, stand, and walk less than two hours total in an eight-hour workday and remain at her workstation for approximately two hours per day. (*Id.*) He noted that she would need to lie down and elevate her legs at hip level or higher more than two hours per day and take seven to eight unscheduled breaks of five to ten minutes each. (*Id.* at 48) Dr. Inguito opined that Antony would be absent or miss at least two hours of work more than four times per month and be off task twenty-five percent of a workday. (*Id.* at 49) Dr. Inguito concluded that Antony could not perform full-time sedentary work on a regular and continuing basis or part-time basis depending on the job. (*Id.* at 51)

On the same day, Antony visited Dr. Schwartz, who observed that although she was still limited in activities, her joint pain had improved. (*Id.* at 57) Dr. Schwartz completed an Arthritis Medical Source Statement,[9] which acknowledged a diagnosis of psoriatic arthritis. (D.I. 6-12 at 86) He noted reduced range of motion in Antony's neck and right hand, joint warmth, joint deformity, joint instability, impaired sleep, weight change, tenderness, reduced grip

---

[8] Dr. Campo is a state agency medical consultant. (D.I. 6-3 at 10-13)

[9] Defendant suggests that this Arthritis Medical Source Statement is completed in different handwriting than the signature line. (D.I. 13 at 13 n.2; D.I. 6-12 at 86-89)

6

strength, swelling, muscle spams, and muscle weakness. (*Id.*) He opined that Antony could sit, stand, and walk less than two hours in an eight-hour workday and would need to shift positions at will. (*Id.* at 87) Furthermore, Dr. Schwartz stated that Antony would often need unscheduled breaks and should elevate her legs fifty percent of an eight-hour workday. (*Id.* at 88) He reported that she can lift and carry less than ten pounds rarely and has significant limitations with reaching, handling, and fingering. (*Id.*) Dr. Schwartz opined that Antony would be absent from work more than four days per month because of her impairment or treatment and that she would be "off-task" for twenty-five percent or more of an eight-hour workday. (*Id.* at 89)

On July 22, 2015, Antony completed a function report, wherein she stated that she was unable to sit or stand for more than five to ten minutes and could not write, type, stand, or walk for extended periods of time. (D.I. 6-7 at 62) She reported that she can no longer run, walk for extended periods of time, exercise, or cook, but could perform personal care tasks. (*Id.* at 63) On August 21, 2015, Antony visited Dr. Inguito for aching joints and low back pain. (D.I. 6-14 at 2) Dr. Inguito noted normal range of motion, strength, and gait. (*Id.* at 5) He opined that her low back pain was improving. (*Id.* at 6) On August 25, 2015, Dr. Jose Acuna ("Dr. Acuna")[10] concluded that Antony had the RFC to complete past relevant work. (D.I. 6-3 at 24-25) Dr. Acuna opined that Antony could lift and carry twenty pounds occasionally and carry and lift ten pounds frequently. (*Id.* at 22) Furthermore, he stated that Antony could stand, walk, and sit for six hours in an eight-hour workday. (*Id.*)

On September 22, 2015, Antony visited Dr. Schwartz and complained of aches and pains in her right elbow, left shoulder, and knees. (D.I. 6-13 at 33) On November 6, 2015, Dr. Inguito opined that Antony's low back pain was progressing as expected. (D.I. 6-14 at 11) On February

---

[10] Dr. Acuna is a state agency medical consultant. (D.I. 6-3 at 22-26)

9, 2016, Antony visited Dr. Inguito for an infection in the fourth finger of her left hand. (*Id.* at 17) On May 11, 2016, Antony returned to Dr. Inguito, who referred her to physical therapy for neck pain and stiffness. (*Id.* at 40-44) On June 14, 2016, Antony visited Dr. Schwartz, complaining that her hands get clenched and painful. (D.I. 6-13 at 37) On July 31, 2016, Antony went to Christiana Care's Emergency Department and received a CT scan of her abdomen and pelvis, which revealed a kidney stone. (D.I. 6-14 at 58; D.I. 6-16 at 34-35) On August 4, 2016, Dr. Inguito noted that Antony had a skin infection on her left index finger, fibromyalgia, intermittent joint ache, fatigue, and flank pain. (D.I. 6-14 at 60) On August 22, 2016, Dr. Inguito reported continued skin infection on Antony's left index finger, intermittent back pain, and left shoulder pain. (*Id.* at 66)

On October 24, 2016, Antony visited Dr. Schwartz, who noted left shoulder pain and dactylitis in the third finger on her right hand. (*Id.* at 41) On the same day, Dr. Schwartz completed an Arthritis Residual Functional Capacity Questionnaire, wherein he opined that Antony could sit, stand, and walk for less than two hours in an eight-hour workday. (D.I. 6-12 at 64) He recommended that Antony needed to shift positions at will and required unscheduled breaks every hour for five to ten minutes to lie down. (*Id.* at 65) He stated that Antony should elevate her legs for fifty percent of an eight-hour workday. (*Id.*) He noted that Antony could occasionally lift and carry less than ten pounds, rarely lift and carry ten pounds, and never lift more than ten pounds. (*Id.* at 66) Dr. Schwartz reported that Antony could rarely twist, stoop, crouch, climb ladders, and climb stairs and had significant limitations in doing repetitive reaching, handling, and fingering. (*Id.*) He opined that Antony would likely be absent from work more than four days per month because of her impairments or treatment. (*Id.* at 67)

On November 2, 2016, Dr. Inguito completed a Medical Opinion by Treating Physician form, wherein he recommended a lifting restriction of five pounds occasionally. (*Id.* at 70) He noted that Antony could stand for five minutes at one time, walk half of a block without stopping, and sit for thirty minutes at one time. (*Id.*) He reported that Antony would need to recline, lie down, or elevate her feet at hip level or higher during an eight-hour workday and could occasionally reach, handle, and finger. (*Id.*) Dr. Inguito concluded that Antony was incapable of performing sedentary or light work eight hours per day. (*Id.* at 71)

On January 18, 2017, Antony visited Dr. Caristo for increased pain in the bottom of her left heel and arch of her left foot which was aggravated by any physical activity. (D.I. 6-13 at 55) Dr. Caristo administered a foot injection in her left heel. (*Id.* at 56) On February 6, 2017, Antony visited Dr. Schwartz for drooping on the right side of her face, continued left shoulder pain, stiffness in her neck, and swelling in the third finger on the right hand. (*Id.* at 43) On February 15, 2017, she received an MRI of her left shoulder, which showed an intrasubstance partial tear of the middle belly of her deltoid muscle, but no evidence of a rotator cuff or labral tear. (*Id.* at 45) On February 21, 2017, Antony visited Dr. Joseph J. Straight ("Dr. Straight") for worsening left shoulder pain aggravated by lifting, movement, pushing, and night pain. (*Id.* at 49) Dr. Straight observed normal passive range of motion and pain about her lateral shoulder upon abduction. (*Id.*)

On March 13, 2017, Joseph Kelly, OTR/L CHT ("Mr. Kelly") completed a disability work assessment, finding that Antony had a range of motion within functional limits in her upper extremities, lower extremities, and cervical, thoracic, and lumbar spine. (D.I. 6-12 at 77) He opined that it would be unlikely that Antony would be able to sustain an eight-hour workday or forty-hour workweek. (*Id.* at 83) On March 27, 2017, Antony visited Dr. Inguito for continued

9

treatment of her kidney stone, fibromyalgia, intermittent joint ache, and fatigue. (D.I. 6-15 at 25) Antony also reported worsening swollen fingers and toes. (*Id.*) On April 26, 2017, Mr. Kelly completed a Medical Source Statement, wherein he concluded that Antony could never lift five or more pounds and would need to occasionally recline or elevate her feet. (D.I. 6-12 at 85) Mr. Kelly opined that Antony could perform less than two hours of sedentary work. (*Id.*)

On June 5, 2017, Antony visited Dr. Caristo for pain in the ball of her left foot which was aggravated by physical activity. (D.I. 6-13 at 58) Dr. Caristo noted that changes in shoe gear provided minimal improvement, recommended a short leg removable cast, and administered a left foot injection. (*Id.* at 58-59) At a follow-up appointment with Dr. Caristo on June 22, 2017, Antony stated that she experienced a fifty percent improvement after receiving the foot injection and wearing a removable cast occasionally. (*Id.* at 60) She received a left foot injection. (*Id.* at 61) On July 6, 2017, Antony noted that she experienced increased pain along her big toes and received another left foot injection. (*Id.* at 62-63) Two weeks later, Antony visited Dr. David T. Sowa ("Dr. Sowa"), who noted recurrent swelling and pain in her right middle finger. (*Id.* at 51) Dr. Sowa observed that there were no bony abnormalities in her left shoulder or right hand. (*Id.*) He advised that there was no possible surgical solution to improve the inflammation. (*Id.*)

On July 24, 2017, Antony reported that wearing the removable cast was causing more pain. (*Id.* at 64) Dr. Caristo recommended continuing the use of her supportive shoe gear and discussed possible stem cell injections. (*Id.* at 65) On September 11, 2017, Dr. Caristo opined that Antony was able to stand as tolerated and did not need to elevate her feet during an eight-hour workday. (D.I. 6-15 at 40)

## ii. Mental Impairments

In a November 10, 2014 New Patient Questionnaire, Antony reported nervousness, tension, mood changes, depression, and anxiety. (D.I. 6-10 at 18) On January 6, 2015, Antony visited Dr. Inguito, who noted anxiety, difficulty concentrating, irritability, and nervousness exacerbated by emotional stress and sleep deprivation. (D.I. 6-11 at 24) From February 2015 through July 2015, Antony visited Dr. Inguito and complained of anxiety, difficulty concentrating, irritability, nervousness, and bipolar disorder. (D.I. 6-12 at 2, 6, 12, 19, 24, 29, 34, 38) Dr. Inguito noted that Antony was cooperative and had normal judgment, mood and affect. (*Id.* at 3, 10, 15, 22, 27, 32, 37)

On June 9, 2015, Antony visited Michele Rossi, LCSW ("Ms. Rossi") and reported feelings of anxiety and depression. (*Id.* at 50) She denied any intent to harm herself or others. (*Id.* at 52) Antony was diagnosed with bipolar disorder, major depressive disorder, and anxiety disorder. (*Id.*) On June 23, 2015, she followed up with Ms. Rossi, who noted no change in her overall status. (*Id.* at 53) Antony practiced breathing exercises, but still had difficulty sleeping. (*Id.* at 54) Six days later, Antony visited Johnny Patterson, PMHNP ("Mr. Patterson"), who noted that she experienced moderate functional impairment, which interfered with some daily activities. (*Id.* at 56) Antony reported racing thoughts, but Mr. Patterson noted that the content of her thoughts, abstract reasoning, and computation were normal. (*Id.* at 58) On July 22, 2015, she returned to Mr. Patterson, reporting continued anxiety, panic attacks, excessive worry, low self-esteem, feelings of guilt, sleep difficulties, and mood swings. (*Id.* at 59)

On August 6, 2015, Antony visited Ms. Rossi, who observed no change in the quality, severity, frequency, or duration of her mood disturbances. (D.I. 6-16 at 2) On August 26, 2015, Antony returned to Ms. Rossi and reported severe anxiety, such that "[her] heart pound[ed] out

11

of [her] chest and time passe[d] so slowly [she] [couldn't] do anything." (*Id.* at 5) Ms. Rossi noted that Antony's mood swings were related to anxiety. (*Id.*) Furthermore, Ms. Rossi reported that Antony's constant pain from arthritis caused her to feel tense, irritable, and on edge. (*Id.*) On September 25, 2015, Ms. Rossi noted that although Antony experienced recurring mood disturbances and unchanged irritability, she reported an improved and more stable mood. (*Id.* at 9) On October 30, 2015, Antony stated that she was very depressed, exhausted, lonely, and constantly in pain. (*Id.* at 14) On December 4, 2015, Antony visited Kristin David, PMHNP ("Ms. David") and noted an improved and more stable mood. (*Id.* at 16) However, she also reported that she felt more depressed and experienced anxiety more frequently. (*Id.*)

On January 29, 2016, Antony returned to Ms. David and reported feeling more depressed, anxious, and irritable. (*Id.* at 19) She stated that she experienced panic attacks daily and that her anxiety was at an "all time high." (*Id.*) Antony also admitted fleeting suicidal ideation but had no plan or intent to act. (*Id.*) On March 1, 2016, Antony was hospitalized due to increased depression and suicidal thoughts. (D.I. 6-15 at 44-45) In a Christiana Care Comprehensive Assessment from the same day, Antony reportedly displayed poor judgment and insight and admitted to occasional suicidal thoughts. (*Id.* at 48, 50) She exhibited racing thoughts, impulsivity, and irritable behavior. (*Id.* at 50) On the next day, Antony was admitted into Meadow Wood Behavioral Health System with signs of mania, dysphoric mood, impulsivity, and increasing irritability. (D.I. 6-13 at 18) She had a GAF score of 25 at admission.[11] (*Id.* at

---

[11] The GAF scale ranges from 0 to 100 and is used by a clinician to indicate his overall judgment of a person's psychological, social, and occupational functioning on a scale devised by the American Psychiatric Association. *See Robinson v. Colvin*, 137 F. Supp. 3d 630, 635 n.5 (D. Del. 2015) (citing American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders* (Text Revision, 4th ed. 2000) (*DSM-IV-TR*)). A GAF score of 21-30 indicates that an individual's "[b]ehavior is considerably influenced by delusions or hallucinations or the individual has a serious impairment in communication or judgment . . . or [an] inability to

12

20) She was discharged on March 8, 2016. (*Id.* at 18) On March 14, 2016, Antony visited Keith Kaut, LPCMH ("Mr. Kaut"), who observed that her functional impairment was mild, as she experienced no interference with daily activities or sleep. (D.I. 6-16 at 23) Antony denied an intent to harm herself or others. (*Id.* at 25)

On March 30, 2016, Antony visited Dr. Kimberly Valentine ("Dr. Valentine"), who opined that Antony's functional impairment was moderate, as she experienced interference with some daily activities but no interference with sleep. (*Id.* at 27) Antony reported that her mood disturbance symptoms were occurring more frequently. (*Id.*) Dr. Valentine noted that Antony had worsening irritability, excessive worry, feelings of hopelessness, nervousness, panic symptoms, and poor motivation. (*Id.*) On May 9, 2016, Antony visited Dr. Andrew W. Donohue ("Dr. Donohue"),[12] who noted cognitive functioning in the normal range and cooperative and attentive behavior without any gross abnormalities. (D.I. 6-13 at 4) Ten days later, Antony revisited Dr. Donohue and reported feelings of tension and anxiety. (*Id.* at 8) Dr. Donohue noted that the frequency and intensity of her anxiety symptoms and excessive worrying had increased and that her demeanor was glum. (*Id.*) On May 24, 2016, Antony returned to Dr. Donohue and stated that she was feeling better. (*Id.* at 10) Dr. Donohue noted that her anxiety symptoms and feelings of fatigue had decreased in frequency and intensity. (*Id.*) She did not describe any depressive symptoms and denied having an intent to harm herself or others. (*Id.*) On June 1, 2016, Dr. Donohue noted intrusive and persistent thoughts, images, impulses, and behaviors of a compulsive type. (*Id.* at 12)

---

function in almost all areas." *Sweeney v. Comm'r of Soc. Sec.*, 847 F. Supp. 2d 797, 802 n.1 (W.D. Pa. 2012) (internal quotation marks omitted).

[12] Dr. Donohue is Antony's psychiatrist and continues to provide treatment. (D.I. 6-2 at 53, 58)

13

On May 9, 2017, Antony visited Dr. Donohue, who reported a euthymic mood with no signs of depression, manic process, anxiety, attentional difficulties, or hyperattentive difficulties. (*Id.* at 6) He also opined that Antony's insight and judgment appeared intact. (*Id.*) On September 15, 2017, Dr. Donohue completed a Mental Health Impairment Questionnaire, wherein he opined that Antony had a poor ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms. (D.I. 6-16 at 69) He reported that Antony had a seriously limited to poor ability to maintain regular attendance and be punctual within customary, usually strict tolerances. (*Id.*) He concluded that Antony had the following seriously limited abilities: (1) understanding and remembering detailed instructions and (2) carrying out detailed instructions. (*Id.* at 70) He noted Antony was seriously limited in the following activities: (1) maintaining attention for a two-hour segment, (2) sustaining an ordinary routine without special supervision, (3) asking simple questions or requesting assistance, and (4) dealing with normal work stress. (*Id.* at 69) He stated that Antony has moderate to marked limitations in maintaining concentration, persistence, or pace and opined that she would likely be absent from work approximately three days per month because of her impairment or treatment. (*Id.* at 71)

### c.    Hearing Before ALJ Faust

#### i.    Antony's Testimony

Antony testified that she currently lives with her husband and daughter. (D.I. 6-2 at 40) She testified that she worked as a bank teller at Farmer's Mechanic Bank and as a caseworker and supervisor at a subsidiary of Sallie Mae.[13] (*Id.* at 40-42) She stated that after a car accident

---

[13] The VE characterized Antony's caseworker employment as work as a "collection clerk." (D.I. 6-2 at 65-66)

14

in 2010, she experienced back pain and could not return to work. (*Id.* at 43-45) She subsequently started working at Boscov's. (*Id.* at 46) When her plantar fasciitis flared, she started to use a boot on her left foot while working, but her employment was terminated shortly thereafter. (*Id.*)

Antony stated that her hands became inflamed due to dactylitis, such that they swell and constantly throb. (*Id.* at 47) She testified that she has difficulty closing her hands, holding a pencil, writing, or typing. (*Id.* at 47, 49) She stated that she is right-handed and she experiences inflammation mainly in her right middle finger. (*Id.* at 48) She described joint pain and limited movement in her wrists. (*Id.* at 49) Antony stated that her feet become swollen, inflamed, and painful. (*Id.* at 50) She experiences burning and tingling in her feet, restless leg syndrome, back pain, hip pain, knee pain, and shoulder pain. (*Id.* at 50-51) She testified that standing is painful and that she experiences limited range of motion in her head and shoulder. (*Id.*) She testified that she battles depression and severe anxiety daily. (*Id.* at 52) She stated that she previously had suicidal ideations and has difficulty concentrating, carrying out tasks, and dealing with stress. (*Id.* at 53)

Antony testified that she is unable to perform household chores and that she relies on her parents to make meals and perform household chores daily. (*Id.* at 60) She tries to do laundry and other household chores, but cannot complete a task without taking breaks. (*Id.* at 61) She stated that some days are better than others. (*Id.*) She lies down during the day, but does not watch television, read, or use a computer. (*Id.* at 61-62)

## ii. Vocational Expert Testimony Before the ALJ

The ALJ posed the following hypothetical to the vocational expert ("VE"):

> Let's assume we have a person who is 29 to 32 years old. They have a high school education. They have past work experience as you identified. Assume they can lift, carry, push, and pull 20 pounds occasionally, 10 pounds frequently. They can sit with normal breaks for eight of eight hours a day and stand and walk with normal breaks for only two of eight hours a day. They can frequently, but not constantly, handle and finger on the right . . . . And this is a right-handed individual . . . . And they cannot do any overhead reaching on the left but can otherwise frequently reach bilaterally. They can occasionally climb ramps and stairs but never ladders, ropes, or scaffolds. They can occasionally balance, stoop, kneel, crouch, and crawl. They can have no more than occasional exposure to extreme cold, extreme heat, wetness, humidity, vibration, fumes, odors, dust, gases, poor ventilation, and hazards. They can perform simple, routine tasks and can have superficial interaction with others. And by superficial, I mean no negotiation, no confrontation, no arbitration, no mediation, and no supervisor or persuasion of others. Could such a person perform any of the claimant's past work?

(*Id.* at 67-68) The VE testified that this individual would not be able to perform claimant's past work as a bank teller or collection clerk. (*Id.* at 68) The ALJ then inquired whether the individual could perform any other work that exists in the national economy. (*Id.*) The VE testified that the individual would be able to perform the following work at the light exertional level: a plastic toy assembler, inspector and hand packager, and garment bagger. (*Id.* at 68-69) The ALJ asked whether a limitation of occasional handling and fingering on the right would affect the individual's ability to perform work. (*Id.* at 69) The VE testified that most unskilled jobs at the light exertional level require bilateral handling and fingering and that she would not be able to find sufficient jobs that would meet that limitation. (*Id.* at 69-70)

The ALJ inquired whether the individual would be able to perform any jobs at the sedentary level. (*Id.* at 70) The VE testified that the individual would be able to perform the following work at the sedentary exertional level: a table worker, finisher, and nut sorter. (*Id.*) The ALJ asked whether a limitation of occasional handling and fingering on the right would

16

affect the individual's ability to perform work. (*Id.* at 71) The VE testified that this limitation would effectively eliminate jobs that would exist in substantial numbers. (*Id.*) The ALJ asked how a limitation of sitting, standing, and walking for less than eight hours a day would affect the individual's ability to perform work. (*Id.*) The VE testified that an individual with these limitations would not be able to perform work. (*Id.*)

The ALJ asked whether being "off task" fifteen percent of the workday or workweek would affect this individual's ability to be employed. (*Id.*) The VE testified that there would be no work for this individual. (*Id.*) The ALJ asked whether missing work twice per month, being late by an hour or more twice per month, having to leave early by an hour or more twice per month, or any combination of these three scenarios would affect this individual's ability to be employed. (*Id.*) The VE testified that the individual would not be able to sustain competitive employment. (*Id.*)

### d.    The ALJ's Findings

Based on the factual evidence in the record and the testimony by Antony and the VE, the ALJ determined that Antony was not disabled under the Social Security Act for the relevant time period of October 15, 2014, the alleged onset date of the disability, through March 31, 2018, the date last insured. (*Id.* at 25) The ALJ found in pertinent part:

1. The claimant last met the insured status requirements of the Social Security Act on March 31, 2018.

2. The claimant did not engage in substantial gainful activity during the period from her alleged onset date of October 15, 2014 through her date last insured of March 31, 2018 (20 CFR 404.1571 *et seq.*).

3. Through the date last insured, the claimant had the following severe impairments: anxiety, major depressive disorder, psoriatic arthritis, degenerative disc disease, plantar fasciitis with history of stress fracture of the left foot, and left shoulder partial deltoid tear. (20 CFR 404.1520(c)).

17

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform a range of light work as defined in 20 CFR 404.1567(b), except she can only stand and/or walk two hours in an eight-hour workday. She also has the following nonexertional limitations: frequently handle and finger with the dominant, right upper extremity; never reach overhead on the left, but otherwise frequently reach with the upper extremities; occasionally climb ramps and/or stairs; never climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; no more than occasionally be exposed to extreme cold, extreme heat, wetness, humidity, vibration, dust, odors, fumes, gases, poorly ventilated areas, and hazards; perform simple, routine tasks; and interact with others on a superficial basis. Superficial is defined as not requiring negotiation, confrontation, mediation, supervision of others, or persuasion of others.

6. Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on September 23, 1985 and was 32 years old, which is defined as a younger individual age 18-49, on the date last insured (20 CFR 404.1563).

8. The claimant has at least a high school education and communicates in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)).

11. The claimant was not under a disability, as defined in the Social Security Act, at any time from October 15, 2014, the alleged onset date, through March 31, 2018, the date last insured (20 CFR 404.1520(g)).

(*Id.* at 16-25)

## III. STANDARD OF REVIEW

Findings of fact made by the ALJ, as adopted by the Appeals Council, are conclusive if they are supported by substantial evidence. *See* 42 U.S.C. §§ 405(g), 1383(c)(3) (2015). Judicial review of the ALJ's decision is limited to determining whether "substantial evidence" supports the decision. *See Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). In making this determination, a reviewing court may not undertake a de novo review of the ALJ's decision and may not re-weigh the evidence of record. *See id.* In other words, even if the reviewing court would have decided the case differently, the court must affirm the ALJ's decision if it is supported by substantial evidence. *See id.* at 1190-91.

Substantial evidence is defined as less than a preponderance of the evidence, but more than a mere scintilla of evidence. *See Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019); *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004) (quoting *Jesurum v. Sec'y of the U.S. Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995)). As the United States Supreme Court has explained, substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (internal quotation marks omitted); *Biestek*, 139 S. Ct. at 1154.

Thus, in the context of judicial review under § 405(g):

[a] single piece of evidence will not satisfy the substantiality test if [the ALJ] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence – particularly certain types of evidence (e.g., that offered by treating physicians) – or if it really constitutes not evidence but mere conclusion.

*Brewster v. Heckler*, 786 F.2d 581, 584 (3d Cir. 1986) (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)). Where, for example, the countervailing evidence consists primarily of a

claimant's subjective complaints of disabling pain, the ALJ "must consider the subjective pain and specify his reasons for rejecting these claims and support his conclusion with medical evidence in the record." *Matullo v. Bowen*, 926 F.2d 240, 245 (3d Cir. 1990).

"Despite the deference due to administrative decisions in disability benefits cases, 'appellate courts retain a responsibility to scrutinize the entire record and to reverse or remand if the [Commissioner]'s decision is not supported by substantial evidence.'" *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (quoting *Smith v. Califano*, 637 F.2d 968, 970 (3d Cir. 1981)). "A district court, after reviewing the decision of the [Commissioner] may, under 42 U.S.C. § 405(g) affirm, modify, or reverse the [Commissioner]'s decision with or without a remand to the [Commissioner] for a rehearing." *Podedworny v. Harris*, 745 F.2d 210, 221 (3d Cir. 1984).

## IV. DISCUSSION

### a. Disability Determination Process

The core issue in this case is whether Antony was disabled within the meaning of the Act at any time from October 15, 2014, the alleged onset date of the disability, through March 31, 2018, the date last insured. (D.I. 6-2 at 25) Title II of the Social Security Act affords insurance benefits "to persons who have contributed to the program and who suffer from a physical or mental disability." *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987) (citing 42 U.S.C. § 423(a)(l)(D) (2015)). A disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(l)(A). A claimant is only disabled if his impairments are so severe that he is unable to do his previous work or engage in any other kind of substantial gainful work existing in the national economy. *See id.* § 423(d)(2)(A); *Barnhart v. Thomas*, 540 U.S. 20, 21-

20

22 (2003). To qualify for disability insurance benefits, a claimant must establish that he was disabled prior to the date he was last insured. *See* 20 C.F.R. § 404.131 (2016); *Matullo*, 926 F.2d at 244.

The Commissioner must perform a five-step analysis to determine whether a particular claimant has met his burden of establishing disability. *See* 20 C.F.R. §§ 404.1520, 416.920; *Plummer v. Apfel*, 186 F.3d 422, 427-28 (3d Cir. 1999). If the Commissioner makes a finding of disability or non-disability at any point in the sequential process, the Commissioner will not review the claim further. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)(i). At step one, the Commissioner determines whether the claimant is engaged in any substantial gainful activity. *See id.* §§ 404.1520(a)(4)(i), 416.920(a)(4)(i) (mandating finding of non-disability when claimant is engaged in substantial gainful activity). If the claimant is not engaged in substantial gainful activity, step two requires the Commissioner to determine whether the claimant is suffering from a severe impairment or a severe combination of impairments. *See id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii) (mandating finding of non-disability when claimant's impairments are not severe). If the claimant's impairments are severe, at step three, the Commissioner compares the claimant's impairments to a list of impairments that are presumed severe enough to preclude any gainful work. *See id.* §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Plummer*, 186 F.3d at 428. When a claimant's impairment or its equivalent matches a listed impairment, the claimant is presumed disabled. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If a claimant's impairment, either singly or in combination, fails to meet or medically equal any listing, the analysis continues to step four and five. *See id.* §§ 404.1520(e), 416.920(e).

At step four, the ALJ considers whether the claimant retains the RFC to perform his past relevant work. *See id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv) (stating claimant is not disabled if able to return to past relevant work); *Plummer*, 186 F.3d at 428. A claimant's RFC is "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Fargnoli v. Massanari*, 247 F.3d 34, 40 (3d Cir. 2001). The claimant bears the burden of demonstrating the inability to return to past relevant work. *See Plummer*, 186 F.3d at 428.

If the claimant is unable to return to past relevant work, at step five, the Commissioner must demonstrate that the claimant's impairments do not preclude him from adjusting to any other available work. *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (mandating finding of non-disability when claimant can adjust to other work); *Plummer*, 186 F.3d at 428. In other words, the Commissioner must prove that "there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and [RFC]." *Plummer*, 186 F.3d at 428. The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether he or she is capable of performing work and is not disabled. *See id.* The ALJ often seeks the VE's assistance in making this finding. *See id.*

**b.      Whether the ALJ's Decision is Supported by Substantial Evidence**

On May 16, 2018, the ALJ found that Antony was not disabled from the alleged disability onset date of October 15, 2014 through the date last insured, March 31, 2018. (D.I. 6-2 at 25) The ALJ concluded that, despite Antony's severe impairments (anxiety, major depressive disorder, psoriatic arthritis, degenerative disc disease, plantar fasciitis with history of stress fracture of the left foot, and left shoulder partial deltoid tear), she had the RFC to perform a full range of work at the light exertional level. (*Id.* at 19) Antony asserts two main arguments on

22

appeal: (1) the ALJ failed to provide adequate reasons for affording Antony's treating source opinions partial or limited weight and (2) the ALJ erred when he failed to recontact Antony's medical sources. (D.I. 11 at 3-19)

### i. Medical Opinion Evidence

Antony first argues that the ALJ erred by failing to provide adequate reasons for rejecting or assigning "partial weight" to the opinions of Dr. Schwartz, Dr. Inguito, Dr. Donohue, and Mr. Kelly. (D.I. 11 at 3-18) Specifically, Antony contends that the ALJ failed to evaluate the medical opinions pursuant to 20 C.F.R. § 404.1527(c). (*Id.* at 9) These factors include: examining relationship, treatment relationship, supportability, consistency, specialization, and other factors such as the extent to which the medical source is familiar with other information in the case. *See* 20 C.F.R. § 404.1527(c).

Although the findings and opinions of treating physicians are entitled to substantial weight, "'[t]he law is clear . . . that the opinion of a treating physician does not bind the ALJ on the issue of functional capacity.'" *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011) (quoting *Brown v. Astrue*, 649 F.3d 193, 197 n.2 (3d Cir. 2011)). Instead, the determination of RFC and disabilities are issues reserved for the Commissioner. *See* 20 C.F.R. § 416.927(d)(2). Moreover, "[a] treating source's opinion is not entitled to controlling weight if it is 'inconsistent with other substantial evidence in [the] case record.'" *See Scouten v. Comm'r of Soc. Sec.*, 722 F. App'x 288, 290 (3d Cir. 2018) (quoting 20 C.F.R. § 404.1527(c)(2)). It is not for the court to re-weigh the medical opinions in the record, but rather to "determine whether substantial evidence exists to support the ALJ's weighing of those opinions." *Ransom v. Berryhill*, C.A. No. 17-939-LPS, 2018 WL 3617944, at *7 (D. Del. July 30, 2018) (citing *Gonzalez v. Astrue*, 537 F. Supp. 2d 644, 659 (D. Del. 2008)).

"[A]n ALJ need not explicitly discuss each [20 C.F.R. § 404.1527(c)] factor in his decision . . . . Instead, an ALJ need only explain his evaluation of the medical evidence for the district court to meaningfully review whether his reasoning accords with the regulation's standards." *Samah v. Comm'r of Soc. Sec.*, 2018 WL 6178862, at *5 (D.N.J. Nov. 27, 2018) (internal quotation marks and citations omitted). Here, the ALJ considered all relevant factors in determining how much weight to afford the opinions of Dr. Schwartz, Dr. Inguito, Dr. Donohue, and Mr. Kelly. The ALJ recognized that Dr. Schwartz and Dr. Inguito were Antony's treating physicians, but explained that he gave their opinion "partial weight" because their opinions were inconsistent with their examination notes and other evidence of record. (D.I. 6-2 at 22-23) The ALJ noted that, in a 2016 arthritis residual functional capacity questionnaire, Dr. Schwartz opined that Antony could sit, stand, and walk for less than two hours in an eight-hour workday and could lift and carry up to ten pounds. (D.I. 6-2 at 23; D.I. 6-12 at 64-66) In a May 18, 2015 arthritis medical source statement, Dr. Schwartz similarly concluded that Antony could sit, stand, and walk for less than two hours in an eight-hour workday and could lift and carry ten pounds or less. (D.I. 6-12 at 87-88) However, the ALJ noted that Dr. Schwartz's assessments were inconsistent with the record. (D.I. 6-2 at 23) For example, Dr. Inguito regularly recorded Antony's normal range of motion, strength, and gait from 2015 through 2017. (D.I. 6-12 at 9, 14, 21, 27, 32, 37; D.I. 6-14 at 5, 10, 15, 19, 25, 30, 38, 43, 50, 55, 63; D.I. 6-15 at 3, 9, 15, 21, 28, 36) Furthermore, Dr. Schwartz had noted a sixty to seventy percent improvement in Antony's left foot pain after receiving Enbrel injections. (D.I. 6-10 at 23)

As to Dr. Inguito, the ALJ found that his 2015 physical and mental functional capacity statement and 2016 medical opinion by treating physician form were inconsistent with the evidence of record. (D.I. 6-2 at 22) In his 2015 physical and mental functional capacity

statement, Dr. Inguito concluded that Antony could carry or lift ten pounds rarely and sit, stand, and walk less than two hours in an eight-hour workday. (D.I. 6-11 at 47) In his 2016 medical opinion by treating physician form, Dr. Inguito opined that Antony was incapable of performing sedentary or light work for an eight-hour workday, as she could stand for five minutes at one time and sit for thirty minutes at one time. (D.I. 6-12 at 70-71) However, the ALJ noted that Dr. Inguito also regularly recorded Antony's normal range of motion, strength, and gait throughout his course of treatment. (D.I. 6-2 at 22; D.I. 6-12 at 9, 14, 21, 27, 32, 37; D.I. 6-14 at 5, 10, 15, 19, 25, 30, 38, 43, 50, 55, 63; D.I. 6-15 at 3, 9, 15, 21, 28, 36) Furthermore, Dr. Inguito had previously recommended a lifting and carrying restriction of no more than thirty-five pounds. (D.I. 6-12 at 3-4)

The ALJ also assigned "limited weight" to the opinion of Dr. Donohue because his responses to a mental health impairment questionnaire were not supported by his treatment notes and other evidence in the record. (D.I. 6-2 at 23) Dr. Donohue opined that Antony had serious limitations in several areas of functioning and that she would be absent from work approximately three days per month. (D.I. 6-16 at 69, 71) However, Mr. Patterson and Dr. Valentine noted that Antony's functional impairment was moderate, as she experienced interference with some daily activities. (D.I. 6-12 at 56; D.I. 6-16 at 27) Mr. Kaut concluded that Antony's functional impairment was mild and that she experienced no interference with daily activities or sleep. (D.I. 6-16 at 23) Moreover, Dr. Donohue's responses to the mental health impairment questionnaire were inconsistent with his treatment notes, which described Antony's euthymic mood without signs of depression, manic process, anxiety, or attentional difficulties. (D.I. 6-13 at 6) He further observed that Antony's "short- and long-term memory are intact, as is [her] ability to abstract and do arithmetic calculations." (*Id.* at 14)

25

The ALJ assigned "partial weight" to the opinion of Mr. Kelly because his assessment was inconsistent with other evidence in the record. (D.I. 6-2 at 23) Mr. Kelly opined that Antony could never lift over five pounds and could perform less than two hours of sedentary work in an eight-hour workday. (D.I. 6-12 at 85) He concluded that Antony would not be likely to sustain an eight-hour workday or forty-hour workweek. (*Id.* at 83) However, the ALJ noted that Mr. Kelly did not have a long-term relationship with Antony. (D.I. 6-2 at 23) Furthermore, other evidence in the record reflected her condition over a long-term basis, and illustrated normal range of motion, strength, and gait. (*Id.*; D.I. 6-12 at 9, 14, 21, 27, 32, 37; D.I. 6-14 at 5, 10, 15, 19, 25, 30, 38, 43, 50, 55, 63; D.I. 6-15 at 3, 9, 15, 21, 28, 36) Mr. Kelly's earlier disability work assessment also found that Antony had a range of motion within functional limits in her upper extremities, lower extremities, and cervical, thoracic, and lumbar spine. (D.I. 6-12 at 77)

Furthermore, Antony asserts that a medical opinion need not be "free of any doubt [or] 100% consistent" and that, viewed in this light, the opinions of her treating sources are not inconsistent with the treatment records. (D.I. 11 at 11-12) Antony cites SSR 96-2p to support this assertion. (*Id.*) However, SSR 96-2p was rescinded effective March 27, 2017, six months prior to Antony's hearing before the ALJ. *See* SSR 96-2p, 2017 WL 3928297 (Apr. 6, 2017). Therefore, SSR 96-2p is not applicable. Antony cites no other legal authority to support her assertion that several allegedly inconsistent medical opinions, read together, leads to the conclusion of consistency within the record. (D.I. 11 at 18) Moreover, these medical opinions were also internally inconsistent with their examination findings. Here, as outlined above, substantial evidence supports the ALJ's determination that the medical opinions of Dr. Schwartz, Dr. Inguito, Dr. Donohue, and Mr. Kelly were inconsistent with evidence of record.

Moreover, Antony suggests that the ALJ impermissibly relied on his own lay judgment to discredit the opinions of his treating medical sources. (D.I. 11 at 18-19) If an ALJ chooses to reject the treating physician's assessment, they may do so only on the "basis of contradictory medical evidence" not because of his or her "own credibility judgments, speculation or lay opinion." *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (citing *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999); *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir. 1988); *Kent v. Schweiker*, 710 F.2d 110, 115 (3d Cir. 1983)). Further, "an ALJ may consider his own observations of the claimant and this Court cannot second-guess the ALJ's credibility judgments," but that does not "override the medical opinion of a treating physician that is supported by the record." *Id.* at 318.

The ALJ did not substitute his lay opinion for the opinions of Dr. Schwartz, Dr. Inguito, Dr. Donohue, and Mr. Kelly, but rather afforded their opinions partial or limited weight because of inconsistencies with the evidence in the record. Thus, substantial evidence supports the ALJ's evaluation of the opinions of Dr. Schwartz, Dr. Inguito, Dr. Donohue, and Mr. Kelly.

### ii. Recontacting Medical Sources

Antony argues that the ALJ erred when he failed to recontact Antony's treating medical sources for "clarification," pursuant to 20 C.F.R. §§ 404.1520b(b) and 404.1519p(b). (D.I. 11 at 19)

20 C.F.R. § 404.1520b(b) states that "[i]f the evidence is *consistent* but we have *insufficient* evidence to determine whether you are disabled, or if after considering the evidence we determine we cannot reach a conclusion about whether you are disabled . . . [w]e *may* recontact your medical source." 20 C.F.R. § 404.1520b(b)(2) (emphasis added). In the case of inconsistencies in the case record, "we will consider the relevant evidence and see if we can

determine whether you are disabled based on the evidence we have." 20 C.F.R. §
404.1520b(b)(1).

Here, the ALJ weighed the inconsistent medical opinions of Dr. Schwartz, Dr. Inguito,
Dr. Donohue, and Mr. Kelly against other substantial evidence in the record. (D.I. 6-2 at 22-23)
The ALJ consequently afforded these opinions partial and limited weight based on inconsistency
with the record. (*Id.*) Because the evidence was sufficient but inconsistent, the ALJ was
required to weigh the evidence presented. *See Campbell v. Colvin*, 2016 WL 4503341, at *3
(W.D. Pa. Aug. 29, 2016) ("An ALJ may only consider recontacting a treating physician, where
the evidence is consistent but there is insufficient evidence to determine whether a claimant is
disabled or after weighing the evidence the ALJ cannot reach a conclusion about whether a
claimant is disabled. The ALJ, however, is not obligated to do so.") (internal citations omitted).
Furthermore, even if 20 C.F.R. § 404.1520b(b)(2) were applicable, the ALJ is not required to
recontact medical sources but such action is discretionary. *See id.* Moreover, "[w]hen an ALJ
does not express 'confusion' about a treating source statement, but, instead, concludes that it
lacks proper support, there is no reason to recontact the physician." *Vargas v. Berryhill*, 2018
WL 1938312, at *7 (M.D. Pa. Mar. 13, 2018) (citing *Ross v. Colvin*, 2015 WL 1636132, at *9
n.4 (M.D. Pa. Apr. 8, 2015)).

Furthermore, 20 C.F.R. § 404.1519p(b) states that "[i]f the report is inadequate or
incomplete, we will contact the medical source who performed the consultative examination,
give an explanation of our evidentiary needs, and ask that the medical source furnish the missing
information or prepare a revised report." 20 C.F.R. § 404.1519p(b). "[T]he ALJ only need re-
contact the medical source when the evidence received from the medical source is inadequate to
determine whether or not the claimant is disabled, not because the ALJ finds the doctor's opinion

inconsistent with the claimant's medical records." *Gladden o/b/o Hyman-Self v. Berryhill*, 2018 WL 1123763, at \*6 (E.D. Pa. Feb. 28, 2018) (internal quotation marks omitted) (quoting *Kelly v. Colvin*, C.A. No. 09-759-RGA-SRF, 2013 WL 5273814, at \*16 (D. Del. Sept. 18, 2013)). Here, Antony has not identified an absence of evidence in the record that indicates a need to recontact any medical sources. (D.I. 11) The ALJ's determination that the record was sufficient to establish that Antony was not disabled without the need for further explanation from medical sources was supported by substantial evidence, as discussed in section (IV)(b)(i), *supra*.

Therefore, the ALJ did not err in failing to recontact any of Antony's treating sources.

## V. CONCLUSION

For the foregoing reasons, the court recommends denying Antony's motion for summary judgment (D.I. 10), and granting the Commissioner's cross-motion for summary judgment (D.I. 12).

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b)(2). The objection and responses to the objections are limited to ten (10) pages each. The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the District Court. *See Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006); *Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987).

The parties are directed to the court's Standing Order For Objections Filed Under Fed. R.

Civ. P. 72, dated October 9, 2013, a copy of which is available on the court's website,

http://www.ded.uscourts.gov.

Dated: January 29 , 2020

Sherry R. Fallon
United States Magistrate Judge